UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
01 FEB 13 PM 1:32
U.S. ...
N.D. OF ALABAMA

WANDA JOCHUM,                    )
                                )
        Plaintiff,              )
                                )
vs.                             )       Civil Action No. CV-99-S-0637-NE
                                )
COOPER INDUSTRIES,              )
                                )       **ENTERED**
        Defendant.             )
                                        FEB 1 4 2001

MEMORANDUM OPINION

This is an employment discrimination case.  Plaintiff Wanda

Jochum was absent from her work at Nicholson File, a division of

Cooper Industries ("defendant"), for twelve weeks during 1997-98,

on paid medical leave.  When she returned to work, Jochum

discovered that the position she formerly held had been eliminated

during a reduction-in-force.  She was not satisfied with the

alternative position offered by her employer and resigned.  She now

contends defendant violated the Family and Medical Leave Act of

1993 ("FMLA"), 29 U.S.C. §§ 2601-2654, the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., and Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

et seq.  The action presently is before the court on defendant's

motion for summary judgment (doc. no. 25).  Upon consideration of

the motion, pleadings, briefs, and the parties' evidentiary

submissions, this court determines that defendant's motion is due

*43.*

to be granted with regard to plaintiff's ADEA and Title VII claims, but denied as to her FMLA claim.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by showing the court there is an absence of evidence to support the non-movant's case. *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings

2

and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th

3

Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512. With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTS

Wanda Jochum began her employment at defendant's Cullman, Alabama "Nicholson File" facility during August of 1976, and worked there until March 4, 1998, when she resigned.[1] She then was 52 years old.[2] The various patterns of files manufactured at the Nicholson plant are grouped into product lines, which are supervised by "product line facilitators."[3] The product line is

---

[1] Plaintiff's memorandum in opposition to defendant's motion for summary judgment (doc. no. 35) at 1.

[2] Plaintiff's date of birth is November 2, 1945. Plaintiff's evidentiary submission (doc. no. 34), Ex. 3 (Jochum declaration) ¶ 1.

[3] *See* Plaintiff's evidentiary submission (doc. no. 34), Ex. 18 (Bateman [sic] deposition) at 6-7.

processed through the plant by employees on the facilitator's teams.   Plaintiff's position as chisel maker is associated with a product line called "mills and flats," which are rectangular files produced for use by individual consumers.   Twenty to twenty-five employees are involved in the production of the "mills and flats" product line.[4]

Defendant's Cullman plant is divided into numbered departments (referred to by defendant as "cost centers"[5]), and the production of a particular product line implicates the operations of several departments.   The "mills and flats" product line, for example, involves grinding (Department 30), cutting (Departments 56 & 57), cropping and buffing (Department 67), trucking operations (Department 28), and chisel makers and grinders (Department 29).[6]

Defendant distinguishes between employees who are directly involved in the manufacturing process, and those only indirectly involved as support personnel.[7] The persons working in Departments 30, 56, 57, and 67 were classified as direct employees, whereas the employees in Departments 28 and 29 were indirect support personnel.

---

[4]*Id.* at 7-8.

[5]Plaintiff's evidentiary submission (doc. no. 34), Ex. 16 (Young deposition) at 15-18.

[6]Bateman [sic] deposition at 7-9.

[7]Plaintiff's evidentiary submission (doc. no. 34), Ex. 19 (Brown deposition) at 15 ("Direct labor is somebody that makes the product.   Indirect means support personnel.").

As a chisel maker working in Department 29, plaintiff was classified as an indirect employee.[8]  Four other employees, all of whom were male, worked with plaintiff in Department 29 as chisel grinders.[9]

## A.   Plaintiff's Employment History

During plaintiff's first weeks at the Nicholson File plant, she was trained in several manufacturing processes, including running a barrel edge machine,[10] working with flat side cutting machines,[11] and putting teeth on butcher steel.[12]  Plaintiff spent the following two years training new employees to operate the same machinery upon which she had been taught, and to check files for defects.[13]  Her next job was as a form maker — a manufacturing process plaintiff referred to as "zinc pots," because one of the duties of a form maker is to pour molten zinc from melting pots into molds.[14]  Plaintiff later received training in chisel making,

---

[8]*Id.* at 9-10.

[9]*See* Young deposition at 17-18.

[10]Plaintiff's evidentiary submission (doc. no. 34), Ex. 13 (Jochum deposition) at 35.  Plaintiff explained:  "...it puts a flat edge on the sharp point of the triangle where you can put teeth on it."  *Id.* at 36.

[11]*Id.* at 36.  The flat side cutting machines "put the teeth on the file." *Id.*

[12]*Id.* at 37.  The butcher steel is "a knife sharpener and you put long grooves in the file and that sharpens the knives."  *Id.*

[13]*Id.* at 38.

[14]*Id.* at 40.

and became a chisel solderer.[15]  Plaintiff performed that job for

three months, and then was transferred to the high speed chisel as

a chisel maker.[16]  She explained her duties in that postion as

follows:  "High speed chisels are M2 steel.  You have to grind the

sides and the bottoms down to make them a certain thickness and a

certain height and then they are turned over to the chisel

grinders."[17]

Plaintiff was the only chisel maker in the plant.[18]  As noted

previously, this position was assigned to Department 29, which also

included four chisel grinders, all of whom were male.  Plaintiff

worked as a chisel maker for fifteen years, until the occurrence of

events that led to this action.  She was the seventh person on the

plant seniority list when she separated from employment.[19]

## B.   Plaintiff's Medical Leave

Plaintiff notified defendant that she had developed severe

peripheral vascular disease on November 26, 1997;[20] she applied for

leave pursuant to defendant's "Disability Income (Accident and

Sickness) Plan," which provides compensated leave to eligible

---

[15]*Id.* at 41.

[16]*Id.*

[17]*Id.* at 42.

[18]*Id.* at 43.

[19]Plaintiff's memorandum (doc. no. 35) at 2.

[20]Plaintiff's evidentiary submission (doc. no. 34), Ex. 9.

7

employees for up to 26 weeks.[21]   She braved open-heart by-pass surgery on December 2, 1997.[22]  Complications affecting plaintiff's kidney and gastrointestinal system developed following the surgical procedure,[23] slowing her recovery.   Plaintiff gradually improved nevertheless, and she was discharged home on January 9, 1998, more than one month after submitting to surgery.[24]

C.   **The January 1998 Reduction in Force**

During January of 1998, while plaintiff still was recuperating from surgery, and as the result of a market analysis forecasting a decreased demand for files, defendant decided to eliminate 35 job positions in a permanent work force reduction.[25]   Donald Young (Director of Human Resources), Bill Brown (one of two area managers in manufacturing), Joe Golden (the other area manager in manufacturing), and other supervisors of the Nicholson File plant met to determine which jobs were to be "closed."[26]  Plaintiff's job

---

[21]Defendant's evidentiary submission (doc. no. 27), Ex. A.

[22]Plaintiff's memorandum (doc. no. 35) at 2.

[23]Medical personnel determined that plaintiff, who had only one kidney, required a stent in her ureter.  Medical personnel also determined that she had a hiatal hernia with some esophagitis and gastritis, which caused difficulty in swallowing.  *Id.*

[24]*Id.*

[25]The report, which is produced on an "as-requested basis," forecasts the number of hours of labor that will be required in a certain area of the plant. The forecast is developed according to such factors as past order patterns, anticipated future sales, and seasonal trends.  As a result of the anticipated decrease in demand for files, defendant decided to eliminate 35 positions.

[26]This is company terminology for the elimination of a job position.  Young deposition at 14.

as chisel maker was one of the positions selected for elimination,[27] and her duties were added to those performed by employees classified as "machinists."[28]

As best this court can understand the RIF process from the parties' woefully inadequate and unhelpful briefs, defendant first decided which job classifications to eliminate, but then selected the 35 least senior employees for layoff, thereby creating position vacancies which more senior impacted employees could occupy through the exercise of rights under the company's layoff, recall, and bid polices discussed hereafter. At least, that is part of what this court has gleaned from the following testimony of Donald Young, the plant's Director of Human Resources:

> A.    ... When the decision is made to cut back employees, and in this case the decision was to reduce head count by thirty-five hourly employees, you simply go down the list of employees and their length of service with the company and you take the junior, or the thirty-five employees with the lest [sic] amount of service with the company, regardless of the job that they are holding at the time and they are laid off outside the company.  They lose their active employment with the company.
>
> ...
>
> A.    Those employees held various jobs in the building. Some of those jobs you still need someone to do that job, so you would put a job posting on the board to give other opportunity to employees to fill that job that's been

---

[27]*Id.* 14-21.

[28]*Id.* at 29-30.

vacated by the employee that was laid off.

There are other jobs within the company that are no longer required, but that job was not impacted by laying off the employees outside the company, so, in fact, you've still got too many people on that job. So you close those jobs and you advise those employees of the closure and give them an opportunity to exercise their rights under the employee handbook to displace another employee.[29]

### 1.   Nicholson's layoff policies

The "Nicholson File Employee Handbook" outlines the procedures

to be followed in the event of a layoff.

Nicholson makes every effort to keep all employees productively employed. Business conditions sometimes change causing a decrease in production demands. Should this occur, the following procedure will be followed.

... If the decrease in business appears to be long term ... the number of employees over and above the number required to maintain production schedules will be laid off. The following procedure will be followed:

1.   Temporary employees will be laid off first.

2.   If further reductions are necessary, the number of excess employees will be laid off. The employees with the least amount of service with the company will be the first laid off.

3.   Employees who are not laid off, but are excess in their job classifications will be declared out of work and their jobs closed. Such job closures shall be determined by the classification, team, and shift affected. The employees within the classification, team, and shift will be declared out of work based on length of service with the

---

[29]*Id.* at 49-51.

company, provided the remaining employees are qualified to perform the available work.   In the event of closure of a skilled job classification (T-Grade), experience in the job will be considered in conjunction with length of service.

[4.] An employee whose job is closed by the above procedure will have the following options:

a. Displace the least senior employee in the same classification, performing the same duties, on another shift on the same team, provided he/she has more service than the least senior employee currently assigned to that job.

b. Displace the least senior employee in the same job classification, performing the same duties on another team on any shift provided the employee is fully qualified to perform the work and that he/she has more service than the employee currently assigned to that job.

c. <u>Return to the most recent previous team, job classification and duties performed on any shift</u>, provided (1) he/she performed the job satisfactorily; (2) has more service than the least senior employee currently assigned to that job and shift; and (3) the job is currently active.   If the employee cannot return to his/her most recent job for reason 1, 2, or 3 above, he/she can return to the second most recent job in accordance with 1, 2, and 3 above.   The employee can return to the second most recent job only if he/she cannot return to his/her most recent job. This option does not extend beyond the second most recent job.   <u>An employee must waive or exercise any of the above options by notifying the company within 48 hours after being notified that his/her job is being closed.</u>   <u>If an employee waives his/her right to return to a previous job, it shall be irrevocable and permanent</u>.   If an employee fails to notify the

company within 48 hours as to which option (a, b, or c above) he/she wishes to waive or exercise, it shall be at the discretion of the company as to which option to utilize or reassign the employee. An employee who <u>cannot</u> exercise options a, b, or c above for any reason specified above, may exercise the following options. (<u>An employee may not exercise the following options if eligible and qualified to exercise options a, b, or c above</u>).

   d.   A displaced employee who cannot exercise options a, b, or c above may displace the least senior employee within the plant in labor grade 1.

   e.   Displace the least senior employee on his/her same team in the same or lower labor grade, regardless of shift, provided he/she meets all established qualifications and can perform the work with normal training.

   f.   Choose an unclaimed open job within the plant if any exists. Order of choice of unclaimed open jobs shall be based on length of service with the company, the most senior employee having first choice and so forth.

   g.   An employee who cannot exercise options a, b, c, d, e, or f above will be laid off and recalled in accordance with the Recall Policy.

<u>If open jobs are available within the plant and an employee chooses not to accept an open job, it will be considered a voluntary quit</u>. <u>If an employee is not able to perform an open job, he/she will be placed on layoff</u>. Such a laid off employee will be recalled when either his/her previous job opens, or when a job opens which he/she is qualified to do.

An employee who chooses and accepts an open job based on his/her service must work the shift on which the job is open.

An employee who is removed from his/her job due to a
reduction in force or job closure may return to that job
only through he Job Bid Program.  A displaced employee
who has held a job and bids on the posted vacancy for
his/her previous job will be given preference over all
other bidders.  ...[30]

## 2.   Nicholson's bid policies

Employees may change job positions during their employment

pursuant to defendant's job bidding program, described in the

Nicholson File Employee Handbook as follows:

Many employees at Nicholson will want to earn more money
by performing higher paying jobs, or a different job.  At
Nicholson, employees advance through the Job Bidding
Program.

When a regular, full time vacancy occurs in an hourly
rated job, a notice will be posted on the Job Bid
bulletin board.  The notice will be posted for 29 hours,
from 11:00 a.m. to 4:00 p.m. the following day.  The
notice will specify the job classification, labor grade,
department, shift and any special qualifications.

Certain jobs may not be posted for bids, since they
require special skills.  Examples of these jobs are tool
maker.  These jobs are filled from within whenever
possible.  Interested employees who feel they are
qualified should fill out a Job Opportunity Program form
in the Employee Relations Department.

...

### Selection of Bidders

Selection of a successful bidder will be based on the
following:

h.        Semi-skilled  ──  (labor  grades  1-4,  job

---

[30]Plaintiff's evidentiary submission (doc. no. 34), Ex. 4 (emphasis added);
*see also id.*, Ex. 5, at 29-32.

13

classification which do not require special
schooling or training).  The employee with the
greatest length of service will be given
preference if he/she is qualified to perform
the work.

i.          Skilled — ("T" Grades, job classifications
which require special skill, acquired through
schooling, training or experience).  A number
of factors will be considered, including the
following:  Technical training, experience,
knowledge of equipment, and general work
record.    If    these    qualifications    are
relatively equal, the bidder with the greatest
length of service will be given preference.

     . . . .

### Bid Procedure

If you desire to bid on a posted job, you must do so
while it is posted.  Bids will not be accepted after the
bid is removed from the board.   Bid forms will be
provided in personnel whenever a job is posted.  To bid,
you should fill out a job bid form submit [sic] to the
Personnel Department.

You may want to find out something about the job that you
are bidding on.  Your facilitator will tell you who to
see about the job.   You do not have to tell your
facilitator that you want to bid.

Should you change your mind about bidding on a job, you
must notify the Employee Relations office before the job
posting is awarded.[31]

In accordance with the foregoing "bid policies," available jobs are

posted on a bulletin board.   Employees who are interested in an

open job may "bid" for the job by filling out a form.   Thus, an

---

[31]Plaintiff's evidentiary submission (doc. no. 34), Ex. 5 (Nicholson File
employee handbook) at 26-28.

employee who has been notified that his or her job position has been "closed" as a result of a RIF may bid for an open job, if any happen to be posted, but only during the 48 hour window of opportunity opening between the time the employee is notified of a position closing and the time the employee must decide whether to exercise his or her option(s) under the layoff policies set out in the preceding section.[32]

As far as plaintiff is concerned, the rub lies in the fact that no open job positions were posted when she returned to work at the beginning of March, 1998.

**D.   Plaintiff's Return to Work**

Three months post-op, plaintiff's physician issued a return to work slip certifying that she had "recovered sufficiently to be able to return to <u>regular</u> work duties on Monday, March 2, 1998."[33] The form also included a section entitled "Restrictions," beside which the physician wrote only that plaintiff should work "No Overtime."[34]   When plaintiff arrived at the plant on the morning of March 2nd, she was greeted by Bill Brown, one of the area managers in manufacturing.   Brown welcomed her back, but added:

---

[32]*See, e.g.*, Young deposition at 43-46.

[33]Plaintiff's evidentiary submission (doc. no. 34), Ex. 8 (emphasis supplied).   The form provided the attending physician the option of circling the adjectives "regular" or "light" as modifiers of the term "work duties"; plaintiff's doctor selected "regular."

[34]*Id.*

15

> "We need to talk to you." [He] Said, "David [Batemon, plaintiff's supervisor] will be over in a little while to talk to you." And I said, "Yes, sir." And then David came over and told me they had eliminated my job and that I had an appointment with Bill at one o'clock to talk the situation over, for me to just show Danny [Wallace, a machinist] how to do the chisels.[35]

Plaintiff had not been previously informed about the elimination of her position as chisel maker, even when she visited the plant the week prior to her return to work, for the purpose of attending a retirement party for a co-worker.[36]

Donald Young, the Director of Human Resources, attended the one o'clock meeting between plaintiff and Bill Brown. Brown explained that plaintiff was not eligible for the options described in paragraphs [4.] a and b of the layoff policy, because she was the only chisel maker in the plant, and the only employee in that job classification.[37] Consequently, Brown said, her only option was to return to her "most recent previous ... job classification" of form maker, in accordance with paragraph [4.] c of the policy.[38] Plaintiff had last performed the duties of a form maker in 1981.[39]

---

[35]Jochum deposition at 79.

[36]Jochum declaration ¶ 13. Bill Brown testified that managers only informed an employee of his or her options under the layoff policy if the employee was on duty; employees who were absent were not notified until they returned to work. See plaintiff's evidentiary submission (doc. no. 34), Ex. 19 (Brown deposition) at 17-18, 29-31.

[37]Young deposition at 86-87.

[38]See Jochum deposition at 80-81.

[39]Jochum declaration ¶ 6.

Even so, Brown advised plaintiff that she must decide within 48 hours whether to accept the offer, and suggested that she observe the manner in which the current form maker performed the duties of that position to assist in making her decision.[40]

One consideration plaintiff had to take into account when deciding whether to accept the offered transfer to a form maker position was that it effectively amounted to a demotion. Her chisel maker position was classified as a "T-1 skilled position," with a pay rate of $13.28 an hour. The form maker position, in contrast, was a "labor grade position," with an hourly pay rate of $12.49.[41] Another consideration she had to take into account was that, while numerous job openings had been posted on the Job Bid bulletin board during the months of January and February of 1998,[42] prior to her return to work, none were available during the 48 hour period within which she had to exercise her option.[43]

During the following two days, plaintiff trained machinist

---

[40]See Id. ¶ 7; Jochum deposition at 80-81.

[41]See plaintiff's evidentiary submission (doc. no. 34), Ex. 6.   Donald Young explained the distinction between T grade and labor grade positions:

> The T is the ― there's two different pay grades in the plant.   The labor grades are 4, the direct and indirect production-related jobs. The T-grades are the more technical jobs in the plant, such as the setup people or maintenance machine shop employees.

Young deposition at 26.

[42]Plaintiff's evidentiary submission (doc. no. 34), Exs. 11, 13.

[43]Plaintiff's memorandum (doc. no. 35) at 8.

17

Danny Wallace in her former skill of chisel-making, and observed employee Billy Evans working as a form maker.[44]    Plaintiff determined that the duties of a form maker had changed since she last held the position.  She noticed that Evans did "[a] lot more than we did before."[45]  For example, during 1981, two employees worked as form makers on each shift.  Plaintiff's duties then consisted of ladling molten zinc from pots in which the metal had been melted, pouring it into molds, knocking the molds loose when the metal cooled, and placing the molded pieces into cutting machines.  The only lifting required of her consisted of moving forms (weighing 20 to 25 pounds each) from a shelf to a table.[46]

In contrast, plaintiff learned by observing Evans that, in 1998, only one employee worked as a form maker on each shift.  She described her perception of the additional duties that would be required of a form maker working alone:  "They have to grind the zincs down, make them smooth for the cutters, cut off the ends.  He has to lift a punch press to cut out the flat zincs, lift the pots.  All of that stuff is required if you're over there by yourself."[47]  Plaintiff observed that Evans was required to run a tow motor and lift a punch press.    The tow motor is a motorized "lifting

---

[44]See Jochum deposition at 96-98.

[45]Id. at 81.

[46]Id. at 47-50.

[47]Id. at 82.

18

apparatus that picks up heavy stuff."[48]  It is, in other words, a stand up fork lift.  Plaintiff observed Evans using the tow motor to change the dies on the machine.  She noted that the form maker is not required to lift the dies, but is required to manually place them into position.  Plaintiff also claims that she would be required to lift the molds and the pots.  She contends that the pots, which weigh about one hundred pounds when empty, require periodic changing, and that she would be required to manually lift them to a height of three to four feet.  Plaintiff was not required to lift pots during her previous stint as a form maker, because the other form maker, who was male, would lift them for her.  Plaintiff assumed that, because the plant only utilized one form maker per shift, she would be required to lift and change the pots.  She did not, however, observe Evans lifting the pots.[49]

Based on her past knowledge of the position and her observations of Evans, plaintiff concluded that she would be unable to perform the duties of a form maker, due to her medical condition.  She principally was concerned about the heavy lifting.  She argues that she would have been unable to lift pots, molds, and dies.[50]  She also contends that she could not have "knocked those

---

[48]*Id.*
[49]*Id.* at 82-89.
[50]*Id.* at 94.

half nuts out of forms," because that duty involved "[h]olding it up in the air and hitting it with a hammer."[51]  Significantly, however, she did not discuss the form maker position with either her doctor or other personnel at the plant.[52]

Plaintiff again met with Bill Brown and Don Young on March 4, 1998,[53] and "asked them if there was anything else I could do besides a form maker, because I didn't believe I could do the job."[54]  Young responded that her only employment option was the form maker position.[55]  Brown and Young explained that no other jobs were available, and that they did not know whether a job would be posted on which plaintiff could bid.[56]  Plaintiff then said rhetorically: "In other words, if I don't take this job I'll have to hit 31"[57]; *i.e.*, the highway, by which she meant discontinue her employment with defendant.[58]  Neither man responded.  Young later documented the substance of the March 4th meeting as follows:

> Interview with Sue Jochum re displacement rates.
> Sue stated she didn't think she would be able to do the
> form maker's job, because it had changed so much.  She
> said when she ... had the job before there were two

---

[51]*Id.* at 95.

[52]*Id.* at 98-99.

[53]Jochum declaration ¶ 11.

[54]Jochum deposition at 93.

[55]Jochum declaration ¶ 12.

[56]Jochum deposition at 93.

[57]Plaintiff was referring to highway 31.  *Id.* at 96.

[58]*Id.*

people there.  Now there's a lot more zincs and dies to change in the press and forklift operation.

Told Sue we would get her in a forklift safety training next week and that all jobs have changed in eighteen years and hers included.  She agreed but said when you are in the job you don't notice it like when you go back.

She stated she was also concerned about starting a domino effect with bumps.  I told her any time we close a job, we expect the displacements and this was not a problem.  Explained her options to her again.  She said she felt she would decline exercising....

... I asked her not to rush into anything.  She said she talked to her husband about it and this was her decision. ... I remember she said she was not going to exercise her seniority rights and she was going to quote, "go to the house." [59]

Plaintiff then walked with Bill Brown to her work station, to clear out her tools.[60]

Plaintiff filed an EEOC charge alleging discrimination on the basis of sex, age, and disability on April 20, 1998.[61]  She filed this action on March 17, 1999.

### III. DISCUSSION

**A.   Plaintiff's Title VII and ADEA Disparate Treatment Claims**

Plaintiff contends that defendant subjected her to disparate treatment because of her gender and age.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, provides

---

[59]Young deposition at 75-77.

[60]*Id.* at 77.

[61]Plaintiff's evidentiary submission (doc. no. 34), Ex. 2.

21

that it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e-2(a)(1). The Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621-634, makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

To prevail, plaintiff must prove that defendant intended to discriminate against her, either on the basis of her sex, or her age, or (conceivably) both protected traits. As the Supreme Court has stated:

> [w]hen a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision. That is, the plaintiff's age [or, as in this case, the plaintiff's gender] must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, ___, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000).

Three forms of proof may be used to establish an employer's intent to discriminate: statistical evidence of a pattern of

discrimination; direct evidence of a discriminatory animus; or circumstantial evidence. The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon which form of proof is used. In this case, however, plaintiff has not offered either statistical proof or direct evidence in support of her disparate treatment claims. Accordingly, each claim will stand or fall upon the strength (or lack thereof) of plaintiff's circumstantial proof of defendant's discriminatory intent.

When evaluating employment discrimination claims supported by circumstantial evidence, courts are guided by the now familiar analytical framework that the Supreme Court announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973), and then elaborated in its progeny. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Reeves, supra*.

The *McDonnell Douglas* analytical framework was developed in the context of Title VII disparate treatment cases. Even so, a variant of the analysis also applies to claims based upon the ADEA. *See Reeves*, 530 U.S. at ___, 120 S.Ct. at 2105 (noting widespread use of *McDonnell Douglas* framework to analyze ADEA claims that are based principally on circumstantial evidence, and assuming its

23

applicability) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (assuming that *McDonnell Douglas* analytical framework applies to ADEA claims based on circumstantial evidence)); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*) (same); *see also, e.g., Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 656 (11th Cir. 1998) (applying *McDonnell Douglas* framework in an ADEA case); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (same); *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir. 1992) (same); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987) (same).

Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If a plaintiff does so, then at the second stage of analysis the burden of production shifts to the defendant to rebut the presumption of intentional discrimination thus created by articulating legitimate, nondiscriminatory reasons for the contested employment action. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If a defendant carries its burden, then in the

final step of inquiry the plaintiff has an opportunity to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 685, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). The plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct' ...." *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Chapman*, 229 F.3d at 1024-25. The plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. duPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir.

1996)) (internal quotation marks omitted).

### 1.   Prima facie elements of Title VII discharge or disadvantageous transfer claims

When a discharge occurs as part of a reduction-in-force, a plaintiff may establish a *prima facie* case by showing (1) she is a member of a protected class, (2) she was terminated, (3) she was qualified for her current (or another) position at the time of discharge, and (4) producing evidence from which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of plaintiff's protected trait when failing to retain her, or consider her for continued employment in another position. *See, e.g., Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998) (national origin and race-based RIF discrimination claims[62]); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 (11th Cir. 1997) (age-based RIF claim); *Coutu v. Martin County Board of County Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995) (national origin RIF claim); *Wilson v. AAA Plumbing Pottery Corp.*, 34 F.3d 1024, 1027-28 (11th Cir. 1994) (race-based RIF claim); *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1557 (11th Cir. 1987) (age-based RIF claim); *Williams v. General Motors*

---

[62]In *Standard*, among other claims asserted, the plaintiff alleged under Title VII and 42 U.S.C. § 1981 that his former employer had discriminated on the basis of race and national origin during a reduction-in-force: *i.e.*, plaintiff, a Caucasian-American, had been discharged, but a Chilean (Hispanic) citizen in this country on a work visa retained.

*Corp.*, 656 F.2d 120, 129-30 (5th Cir. 1981) (age-based RIF claim), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

Satisfactory evidence of an employer's intention to discriminate on the basis of gender (or age) would include proof that plaintiff was selected for discharge during the reduction-in-force, while others not in the plaintiff's protected class, having comparable or lesser qualifications, were retained. *Cf. Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (race-based termination claim).

"In order to establish job discrimination in transfers and assignments, a plaintiff must meet a burden similar to the one required for showing discrimination in promotions." *Alexander v. Fulton County, Georgia*, 207 F.3d 1303, 1344 (11th Cir. 2000). To establish a *prima facie* case in that context, a plaintiff must show: (1) membership in a protected class; (2) qualification to perform the duties of the job to which she was originally assigned; (3) transfer to another job position or adjustment of existing job duties that is sufficiently significant to constitute an adverse employment action; and, (4) more favorable treatment of similarly-situated employees outside the protected class.

**2.    Prima facie elements of ADEA discharge or transfer claims**

Actions brought to enforce the Age Discrimination in

27

Employment Act are analyzed in a similar fashion. In ADEA cases, the plaintiff has the ultimate burden of proving that age was a determinative factor in the contested employment decision. The Eleventh Circuit alters slightly the elements of a prima facie case in two situations: a reduction-in-force ("RIF"); and, when a position is eliminated in its entirety. In these instances, the plaintiff establishes a prima facie case of age discrimination by demonstrating that (1) she was a member of the protected group of persons between the ages of 40 and 70,[63] (2) she was discharged, (3) she was qualified for her current position, or to assume the duties of a comparable position, at the time of discharge, and (4) by producing sufficient evidence from which a factfinder could reasonably conclude that the employer intended to discriminate on the basis of age in making the decision to transfer or discharge plaintiff. *See Mitchell v. USBI Company*, 186 F.3d 1352, 1354 (11th Cir. 1999); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1208 (11th Cir. 1997); *Jameson v. Arrow Co.*, 75 F.3d 1528, 1531-32 (11th Cir. 1996); *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 567-68 (11th Cir. 1992); *Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990); *Verbraeken v. Westinghouse Electric*

---

[63]The protections of the ADEA extend to those individuals who "are at least 40 years of age but less than 70 years of age." 29 U.S.C. § 621(a).

*Corp.*, 881 F.2d 1041, 1045-46 (11th Cir. 1989), *cert. dismissed*, 493 U.S. 1064, 110 S.Ct. 884, 107 L.Ed.2d 1012 (1990).

In an ADEA case where a demotion is the adverse action complained of, a plaintiff may establish a prima facie case by showing that (1) she was a member of the protected group of persons between the ages of 40 and 70,[64] (2) she was subjected to an adverse employment action in the form of a demotion, (3) she was qualified to perform the duties of the job from which she was demoted, and (4) a substantially younger person was placed or promoted into her former position.[65]  *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1997) (citing, *e.g., O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (stating that an ADEA plaintiff must show that he was replaced by someone "substantially younger," not necessarily by someone under the age of 40)).

---

[64] The protections of the ADEA extend to those individuals who "are at least 40 years of age but less than 70 years of age." 29 U.S.C. § 621(a).

[65]    Unlike race and sex discrimination cases, the plaintiff in an age discrimination case need not necessarily prove that his replacement was outside the protected class, that is, under forty years of age.  The plaintiff in an age discrimination case may establish a prima facie case merely by establishing that his replacement was younger than he, provided that the discrepancy between the ages, along with any other relevant evidence, is sufficient that a fact finder could reasonably infer age discrimination.

Corbin v. Southerland Intern. Trucks, 25 F.3d 1545 (11th Cir. 1994).

### 3.   Defendant's position

Here, defendant does not deny either that plaintiff is a female who was more than 40 years of age on the date of the contested employment action, or that she was qualified to perform the duties of a chisel maker.   Defendant instead denies that plaintiff suffered an adverse employment action, arguing that she voluntarily resigned.[66]   Defendant also disputes whether plaintiff has produced evidence from which a jury could reasonably conclude either that defendant intended to discriminate against her on the basis of her gender, or that age was a determinative factor in the contested employment decision.

### a.   The concept of an "adverse employment action"

An employment action is <u>not</u> "adverse" merely because the employee dislikes it or disagrees with it.   Neither "every unkind act,"[67] nor "everything that makes an employee unhappy,"[68] amounts to an "adverse employment action."[69]   Thus, it is not enough that an employment decision imposes some *de minimis* inconvenience or alteration of the terms, conditions, or privileges of employment. Moreover, "a <u>purely</u> lateral transfer" —— that is, a reassignment to

---

[66]*See* defendant's memorandum (doc. no. 28) at 16-18.

[67]Doe v. Dekalb Co. School Dist, 145 F.3d 1441, 1449 (11th Cir. 1998) (*quoting* Wu v. Thomas, 996 F.2d 271, 273 n.3 (11th Cir. 1993) (*per curiam*)).

[68]*Doe*, 145 F.3d at 1450 (*quoting* Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)).

[69]*Doe*, 145 F.3d at 1449 (*citing Wu*, 996 F.2d at 273).

30

another job position that does <u>not</u> involve a demotion, or a loss of pay or other tangible benefits of employment — cannot rise to the level of an "adverse employment action."[70] Rather, a plaintiff must prove that a reasonable person, placed in her same position, would have viewed the contested employment action as being sufficiently serious, <u>and</u>, as having a tangible adverse effect on the terms, conditions, or privileges of employment, before it may be said to rise to the level of an "adverse" employment action.

The Eleventh Circuit has indicated that a district court's analysis of whether a contested employment action was sufficiently "adverse" to implicate federal statutory protections should take into account conclusions reached with respect to other relevant employment discrimination laws. *See Doe v. DeKalb County School District*, 145 F.3d 1441, 1448 (11th Cir. 1998) (an ADA case observing that Eleventh Circuit "precedents interpreting [Title VII and the ADEA] have often relied on the same 'adverse employment action' concept that is an essential element of a *prima facie* ADA case," and courts accordingly "can assist ... consideration of the adversity standard under the ADA ... by looking to the broader experience of our court and others with employment discrimination law"). *Cf. Smith v. Alabama Department of Public Safety*, 64 F.

---

[70]*Id.* (citations omitted).

Supp. 2d 1215, 1221 (M.D. Ala. 1999) (applying adverse employment action analysis from *Doe* to action brought under Title VII).

In *Doe*, the Eleventh Circuit clarified the analysis that must be undertaken to determine whether a contested employment decision is sufficiently adverse to warrant scrutiny under federal employment discrimination laws.  The narrow issue before the *Doe* court was whether the plaintiff's subjective belief that an undesired transfer was an adverse employment action constituted sufficient proof of "adversity."  The *Doe* court concluded it was not, and committed the adverse employment action analysis to an objective standard:

> Having determined that we are not bound to a subjective standard, we adopt an objective test:  An ADA plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse.  In our view, this test best reflects our employment discrimination doctrine and precedents.
>
> . . .
>
> As in the Eleventh Circuit, all of the cases that have found a transfer to be adverse appear to have based their conclusions on objective factors. ... In other words, our sister circuits have only held transfers to be adverse where the transfers were objectively equivalent, at least to some degree, to demotions.

*Doe*, 145 F.3d at 1448-49, 1450 (reiterating that weight of authority leads to conclusion that "purely lateral" transfers do not constitute adverse employment actions).  *See also Smith*, 64 F.

Supp. 2d at 1221-22 (finding that Title VII plaintiff could not establish adverse employment action, because he suffered no loss in pay, benefits, or classification, only great embarrassment). *Cf.* *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994) (noting that, for purposes of § 1983, "'adverse employment action' is broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands").

In the present action, plaintiff's alternatives following the January 1998 reduction-in-force were these:  to accept transfer to the form maker position; or to accept termination of her employment.  Defendant contends that plaintiff did not suffer an adverse employment action as required for recovery under Title VII and the ADEA, because she voluntarily elected to resign.  Although there is some authority outside the Eleventh Circuit holding that, "[w]hen an employee voluntarily resigns, he cannot claim that he suffered an adverse employment decision under the ADA or the FMLA," *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999), this court does not agree.

Rather, as discussed at the conclusion of this opinion in connection with the damages that are recoverable under the FMLA, this court is of the opinion that an employee's voluntary

33

resignation is a failure to mitigate, thereby cutting off a claim for back pay damages. *Cf. Hazel v. U.S. Postmaster General*, 7 F.3d 1, 4-5 (1st Cir. 1993) (a Title VII and ADEA case holding that an employee's "right to oppose discrimination is not a right to refuse to work on account of discrimination," and that when an employee refuses to accept under protest a job position offered by his employer "he cannot recover any damages because of his failure to mitigate by reporting to work in the new post. ... The failure to mitigate undercuts any claim for back pay.").

This court concludes that plaintiff was presented with an adverse employment decision, regardless of which choice she made. Her first option was to accept transfer to form maker, a position that represented both a loss of status (from a "T grade" skilled position to a labor grade) and pay (from $13.28 to $12.49 an hour, a 79¢ (or 5.95%) reduction in hourly compensation). A reduction in pay of almost 6% is not *de minimus* or inconsequential. Her other option was termination: the "classic and ultimate 'tangible employment action.'" *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 n.18 (11th Cir. 1998).

### b.   Plaintiff's proof of defendant's intent

Finally, plaintiff must produce evidence from which a factfinder could reasonably conclude either that her age was a

34

determinative factor in defendant's contested employment decision, or that defendant intended to discriminate against her based on her gender.

Plaintiff contends that defendant's failure to follow the layoff procedures outlined in its employee handbook is circumstantial evidence of discrimination. This court disagrees: plaintiff has not offered any evidence from which a reasonable factfinder could conclude that the policy was applied in a discriminatory manner. Moreover, this court notes that, if plaintiff had exercised her option under paragraph 4c of the layoff policy, she would have displaced Billy Evans, a male employee.

The remainder of plaintiff's evidence consists of conclusory assertions. Plaintiff, who was the only female in her department, assumes that defendant discriminated against her because of her gender, because she was the only person in her department whose job was eliminated.[71] She also argues that she was paid less than the male members of her department. In doing so, however, she ignores these facts: she was the only chisel _maker_ in the plant; male employees were chisel _grinders_; and, her chisel _maker_ position was classified as a T-1 skill level, while chisel _grinder_ positions were classified at a higher-paying, T-5 skill level.[72] Plaintiff

---

[71]Jochum deposition at 130, 138.

[72]_Id._ at 134.

further admits there are no similarities between the duties of chisel makers and grinders.[73] She also admits she neither desired to become, nor applied for, a chisel grinder position.[74] In fact, she never expressed an interest in any other position while employed as a chisel maker.[75] Plaintiff testified that she believed Bill Brown selected her chisel maker position for elimination, because "he was trying to save one of his male employee's job" (a position she identified as "[t]he setup man in [the foreign files] department").[76] She believes Chief Executive Officer Bill Dylan instructed Brown to eliminate a T-grade position, because "he was going to have to get rid of some more overhead."[77] When asked how she knows this, plaintiff replied, "I don't.   I just believe this."[78]

Plaintiff's allegations of age discrimination are similarly conclusory.  She asserted in deposition that Brown discriminated against her on the basis of age, "[b]ecause they were getting rid of supervisors that was fifty-eight, so why not get rid of employees that's in their fifties."[79]  Plaintiff admits, however,

---

[73]*Id.* at 135.
[74]*Id.* at 136.
[75]*Id.*
[76]*Id.* at 139-40.
[77]*Id.* at 142.
[78]*Id.*
[79]*Id.* at 155.

that the supervisors who resigned were "offered ... a good deal and they got out,"[80] and she is unable to demonstrate a connection between the early retirement of the supervisors and the elimination of her position.[81]

---

[80]*Id.* at 156.

[81]The following exchange occurred in deposition:

Q.    So you think Mr. Brown, because they were getting rid or allowing these gentlemen to take packages and retire early, that that has something to do with you?

. . .

A.    Yes, sir, I do.

Q.    What leads you to believe it has something to do with you and your age?

A.    Because of my age.

Q.    So part of what makes you believe that you were discriminated against on the basis of your age was the package that was offered to these gentlemen who were in their late fifties?

. . .

A.    They have — several other people that that happened to, too.

Q.    And you don't know what their names are?

A.    No, I don't.

Q.    You know that they left the company and signed the severance package?

A.    Oh, no, no.  This was hourly.  This was hourly.

Q.    These were hourly people?  Do you know who they are?

A.    No, I don't.

Q.    Do you know what their ages are?

A.    No, sir.

Q.    Do you know when that was?

37

In sum, plaintiff has not offered evidence from which a factfinder could reasonably conclude either than defendant intended to discriminate against her on the basis of her gender, or that her age was a determinative factor in the contested employment decision. Accordingly, summary judgment is due to be granted on her Title VII and ADEA disparate treatment claims.

## B.   Plaintiff's Family and Medical Leave Act Claim

Plaintiff's remaining claim is based upon the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654.

The FMLA prescribes[82] two substantive rights for eligible employees[83] of a covered employer.[84] The first is the right to take

---

A.    No, sir.

*Id.* at 157-158.

[82]*See, e.g.*, Peters v. Community Action Committee, Inc., 977 F. Supp. 1428, 1432 (M.D. Ala. 1997) (characterizing 29 U.S.C. §§ 2612 and 2614 as "confer[ring] new and affirmative entitlements and thus [as] essentially <u>prescriptive</u>" in nature) (emphasis added)).

[83]"Not all employees are eligible for leave under the FMLA." Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 795 (11th Cir. 2000). Rather, the Act defines those who are as follows:

> The term "eligible employee" means an employee who has been employed—
> (i)   for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and
> (ii)  for at least 1,250 hours of service with such employer during the previous 12-month period.

29 U.S.C. § 2611(2)(A). Certain highly compensated (or key) employees and others are excluded from the operation of the Act. *See id.* §§ 2611(2)(B), 2614(b); *see also* 29 C.F.R. § 825.10; 60 Fed.Reg. at 2242 and § 9:26.

[84]29 U.S.C. § 2611(4)(A)(i) defines the term "employer" as meaning "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;..."

an unpaid[85] leave of absence from work for as many as 12 workweeks[86]

during any 12-month period for one or more of the reasons specified

in 29 U.S.C. § 2612(a)(1),[87] including "a serious health condition

---

[85]The FMLA explicitly permits employers to provide covered leave on an
unpaid basis, 29 U.S.C. § 2612(c), and FMLA leave generally is unpaid. *See* 29
C.F.R. § 825.207(a), 60 Fed.Reg. at 2248. If an employer provides paid leave
benefits to its employees, however, then the FMLA provides that "[a]n eligible
employee may elect, or an employer may require the employee, to substitute any
of the accrued paid vacation laevae, personal leave, or medical or sick leave of
the employee for ... any part of the 12-week period" of FMLA leave. 29 U.S.C.
§ 2612(d)(2)(B). The Eleventh Circuit recently construed this provision as
follows:

> The logical purpose underlying the substitution language in
> the FMLA and accompanying regulations is to protect employers who
> offer paid sick leave benefits to their employees from having to
> provide both the statutory 12 weeks of leave required by the FMLA
> and the paid leave benefit separately. If employers could not
> require a sick employee to use accrued paid sick leave and FMLA
> leave concurrently when the employee's condition qualifies for both,
> then the employee could choose to use his paid leave benefit and his
> 12 weeks of FMLA leave sequentially. This would unduly and unfairly
> burden employers. To balance the needs of employers and sick
> employees, Congress intended that the FMLA provide employees with a
> minimum entitlement of 12 weeks of leave, while protecting employers
> against employees tacking their FMLA entitlement on to any paid
> leave benefit offered by the employer.

Strickland v. Water Works and Sewer Board of the City of Birmingham, __ F.3d __,
2001 WL 50433, at *5 (11th Cir. Jan. 22, 2001) (footnote omitted).

[86]The FMLA provides that leave need not be taken as a 12 week block, but
may be taken "intermittently or on a reduced leave schedule when medically
necessary." 29 U.S.C. § 2612(b)(1).

[87]29 U.S.C. § 2612(a)(1) provides that, subject to medical certifications
described in § 2617,

> an eligible employee shall be entitled to a total of 12 workweeks of
> leave during any 12-month period for one or more of the following:
>
> > (A) Because of the birth of a son or daughter of the
> > employee and in order to care for such son or daughter[;]
>
> > (B) Because of the placement of a son or daughter with
> > the employee for adoption or foster care[;]
>
> > (C) In order to care for the spouse, or a son, daughter,
> > or parent, of the employee, if such spouse, son, daughter, or

39

that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

The second substantive entitlement is the right of the employee, upon returning from leave, to be restored to the same employment position held by the employee when leave commenced, <u>or</u> to be placed in an equivalent position, with equivalent benefits, pay, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1).[88]

To secure the availability of the foregoing entitlements, and to enforce them, Congress declared it "unlawful for any employer to interfere with, restrain, or deny the exercise of[,] or the attempt

---

    parent has a serious health condition[; or]

        (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1); *see also id.* § 2601(b)(2).
    [88]29 U.S.C. § 2614(a)(1) provides:

    Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave—

        (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

        (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

The rights of restoration established by § 2614(a)(1) are not absolute; rather, as discussed hereafter, they are circumscribed by statutory, regulatory, and caselaw qualifications.

40

to exercise, any right provided under this subchapter [of the FMLA]." 29 U.S.C. § 2615(a)(1). In addition, Congress declared it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]," 29 U.S.C. § 2615(a)(2), or because such individual—

> (1) has filed any charge, or has instituted or caused to be instituted any proceedings, under or related to [the FMLA];

> (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under [the FMLA]; or

> (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under [the FMLA].

29 U.S.C. § 2615(b); see also 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees ... who have used FMLA leave.").

Consistent with the foregoing statutory provisions, the caselaw gloss layered upon the FMLA recognizes two types of claims for alleged violations of the Act: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act ... and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected

41

by the Act...." *Strickland v. Water Works and Sewer Board of the City of Birmingham*, ___ F.3d ___, 2001 WL 50433, at *6 (11th Cir. Jan. 22, 2001) (emphasis added) (citations and footnote omitted). *Accord O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000).   The elements of proof for each type of claim are different.

> To state <u>a claim of interference</u> with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied. *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000); *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). In contrast, to succeed on <u>a retaliation claim</u>, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right. *King*, 166 F.3d at 891. In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Id.* ...

> When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, we apply the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for evaluating Title VII discrimination claim. *See Brungart v. BellSouth Telecomm. Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). In order to state <u>a claim of retaliation</u>, an employee must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. *Parris v. Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000). ...

*Strickland*, ___ F.3d at ___, 2001 WL 50433, at *6 (<u>emphasis</u> added);

*see also Brungart*, 231 F.3d at 798; *Earl v. Mervyns, Inc.*, 207 F.3d

1361, 1367 (11th Cir. 2000); *Graham v. State Farm Mutual Insurance*

*Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Dollar v. Shoney's,*

*Inc.*, 981 F. Supp. 1417, 1419 (N.D. Ala. 1997); *Kaylor v. Fannin*

*Regional Hospital, Inc.*, 946 F. Supp. 988, 999 (N.D. Ga. 1996);

*Peters v. Community Action Committee, Inc.*, 977 F. Supp. 1428, 1435

(M.D. Ala. 1997).  *Accord, King*, 166 F.3d at 892.

In the present case, plaintiff disavows an FMLA retaliation

claim, and asserts <u>only</u> an interference claim for defendant's

denial of her substantive rights under 29 U.S.C. § 2614(a)(1) to be

restored to the same position she held prior to taking FMLA leave,

or to be placed in an equivalent position.[89]  She characterizes such

a claim as "a form of strict liability."[90]

However, plaintiff's "strict liability" argument ignores the

fact that the statutory right of restoration is <u>not</u> absolute.

Indeed, Congress expressly provided that nothing in the FMLA should

---

[89]See note 89 and related text *supra*.

[90]Plaintiff's memorandum (doc. no. 35), at 19.  As authority for this
proposition, plaintiff cites Kaylor v. Fannin Regional Hospital, Inc., 946 F.
Supp. 988 (N.D. Ga. 1996), in which the district court observed that "[t]he plain
meaning of 'shall be unlawful' as used in the text of § 2615(a)(1) ... strongly
suggests a strict liability standard applies for anhy 'denial' or 'attempt to
[deny]' the exercise of a right provided under the FMLA.  ... [T]he use of 'shall
be unlawful suggests that any employer who violates § 2615(a)(1) of the FMLA is
strictly liable, regardless of the intent of its actions."  *Id.* at 996 (emphasis
supplied) (footnote omitted).

be construed "to entitle any restored employee to ... any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."   29 U.S.C. § 2614(a)(3)(B).[91] Pivoting off that statutory language, the Department of Labor[92] declared that "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment [upon returning to work] than if the employee had been continuously employed during the FMLA leave period."   29 C.F.R. § 825.216(a).   Further, the

---

[91]In full text, § 2614(a)(3) provides that:

Nothing in this section shall be construed to entitled any restored employee to—

(A) the accrual of any seniority or employment benefits during any period of leave; or

(B) any right, benefit, or position or employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave.

29 U.S.C. § 2614(a)(3); see also id. § 2614(b), providing that:

An employer may deny restoration under subsection (a) of this section to any eligible employee described in paragraph (2) if—

(A) such denial is necessary to prevent substantial and grievous economic injury to the operations of the employer;

(B) the employer notifies the employee of the intent of the employer to deny restoration on such basis at the time the employer determines that such injury would occur; and

(C) in any case in which the leave has commenced, the employee elects not to return to employment after receiving such notice.

[92]29 U.S.C. § 2654 authorizes the Secretary of Labor to prescribe such regulations as are necessary to implement the FMLA.

44

Eleventh Circuit held, upon the basis of the preceding regulation, that "an employer can deny the right of reinstatement in certain circumstances," such as when the employee is laid off as part of a general reduction-in-force.  *O'Connor*, 200 F.3d at 1354 (citing *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1157 (7th Cir. 1997) (also holding an employer may terminate an employee on FMLA leave as part of a RIF)).

   "In other words, if an employer can show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable." *Strickland*, ___ F.3d at ___, 2001 WL 50433, at *7; *see also Peters*, 977 F. Supp. at 1432 (holding that "a restored employee 'does not step back on the [employee benefit] escalator at the point [s]he stepped off.'  ... Rather, she 'steps back on at the precise point s[he] would have occupied had [s]he kept h[er] position continuously.'") (quoting *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 284-85, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946) (alterations in original)).

   Thus, merely because an employee is entitled to, and takes, FMLA leave does <u>not</u> mean that the employer cannot thereafter, under any circumstances, lay-off or discharge that employee.  Rather, an employer lawfully may evaluate its employees according to how the

employer views their qualifications; and, if an employer has a reason, not affected in any way by an employee's FMLA leave, to lay-off or discharge a certain employee, then the employer may do so, regardless of the employee's act of exercising FMLA leave.

In such a case, however, "the employer bears the burden of proving that the employee would have been laid off during the FMLA period for reasons unrelated to the employee's condition, and therefore is not entitled to restoration." *Parris*, 216 F.3d at 1301 n.1 (citing *O'Connor*, 200 F.3d at 1354 ("[W]hen an 'eligible employee' who was on FMLA leave alleges her employer denied her FMLA right to reinstatement, the employer has an opportunity to demonstrate it would have discharged the employee even had she not been on FMLA leave.")). In other words, this is an affirmative defense, upon which the employer bears the burden of persuasion. Such a construction is consistent with regulations promulgated by the U.S. Department of Labor:

> (a) An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. <u>An employer must be able to show</u> that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. For example:
>
> > (1) If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to

> continue FMLA leave, maintain group health plan
> benefits and restore the employee cease at the time
> the employee is laid off.... An employer would
> have the burden of proving that an employee would
> have been laid off during the FMLA leave period
> and, therefore, would not be entitled to
> restoration.

29 C.F.R. § 825.216(a)(1) (emphasis added).

Plaintiff has not effectively rebutted defendant's assertion that plaintiff's chisel maker position was eliminated as part of the RIF conducted during January of 1998. Consequently, plaintiff could not have been "restored by the employer to the position of employment held by [her] when the [FMLA] leave commenced." 29 U.S.C. § 2614(a)(1)(A).

On the other hand, defendant has not demonstrated that the form maker position offered plaintiff upon her return to work was "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B). The circumstances involved in the present action are similar to those addressed by the Eleventh Circuit in *Parris*, where an employee of The Miami *Herald* Publishing Company was notified that his position would be eliminated as part of a restructuring of the newspaper's departments. 216 F.3d at 1299-1300. Parris began seeking alternative job opportunities within the company. *Id.* at 1300. Before he could acquire another

47

position, however, Parris's home was burglarized, and he was brutally assaulted when he tried to protect himself and his family from the intruder. He was severely injured, and forced to take a medical leave of absence. His employment with the newspaper was terminated while he was absent on FMLA leave. The district court entered summary judgment in favor of the newspaper, finding the plaintiff's employment had been slated for elimination prior to the burglary and ensuing medical leave. The Eleventh Circuit reversed, finding the existence of genuine issues of material fact "on two questions: (1) whether prior to his attack ... the Herald had slated Parris's position ... for elimination on any specific date; and (2) whether the Herald would have terminated his employment ... on July 31, 1996 if Parris had never been absent for the weeks he took sick leave." *Id.* at 1302. The court further found that, "[b]ecause [Parris's] employment could continue uninterrupted if he transferred to a different position, we do not view the termination of his position as equivalent to the termination of his employment with the Herald." *Id.* n.3.

In a similar vein, plaintiff Wanda Jochum has raised genuine issues concerning defendant's argument that no position or option other than transfer to form maker was available to her. She asserts, for example, that she should have been allowed to exercise

the option described in that paragraph of defendant's layoff and recall policy providing:  "If an employee is not able to perform an open job, he/she will be placed on layoff.  Such a laid off employee will be recalled when either his/her previous job opens, or when a job opens which he/she is qualified to do."[93]  Moreover, plaintiff reasonably asserts:  that she should have been notified of the RIF while recuperating from surgery; and that, if she had been so notified, she would have been able to bid for positions that were posted on the Job Bid Bulletin board during January and February of 1998.  For such reasons, a factfinder could reasonably conclude that defendant failed to carry its burden of proving the affirmative defense that no equivalent position, with equivalent employment benefits, pay, and other terms and conditions of employment, was available.  Thus, defendant's motion for summary judgment is, to that extent, due to be denied.

Even so, such a ruling raises an intriguing question about what plaintiff gains from the decision.  The relief available under the FMLA for an employer's interference with (or denial of) the Act's substantive entitlements includes "such equitable relief as may be appropriate, including employment, reinstatement, and promotion," 29 U.S.C. § 2617(a)(1)(B), as well as the recovery of:

---

[93]Plaintiff's evidentiary submission (doc. no. 34), Ex. 4.

(i) lost wages and other benefits (or, in the absence of lost wages and benefits, any actual monetary losses sustained by the employee); (ii) interest on the foregoing amount; (iii) liquidated damages in an amount equal to the sum of the amounts described in (i) and (ii), 29 U.S.C. § 2617(a)(1)(A)(i)-(iii); and (iv) attorneys' fees and costs. 29 U.S.C. § 2617(a)(3).

Neither punitive nor compensatory damages for mental distress are recoverable. *See McAnnally v. Wyn South Molded Products, Inc.*, 912 F. Supp. 512 (N.D. Ala. 1996).

Moreover, as observed in the discussion of the concept of an "adverse employment action" in section III.A.3.a *supra*, plaintiff's refusal of defendant's tender of the form maker position (and, hence, her resignation) cut off her right to recover back pay. *Cf. Hazel v. U.S. Postmaster General*, 7 F.3d at 4-5. Such a holding is consistent with a large body of precedent developed in the context of Title VII jurisprudence.

One of the purposes of Title VII — like the other federal statutes proscribing discrimination in the workplace — is that of making "persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418-19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (Title VII case). Consistent with that concept, a successful plaintiff "is

presumptively entitled to back pay from the date of the discriminatory discharge until the date of judgment, unless the victim obtains or could have obtained substantially equivalent work before that time." *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1251 (11th Cir. 1997) (ADEA case) (citing 29 U.S.C. § 626(b), and, *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 794 (3d Cir. 1985) (holding that back pay is "a mandatory element of damages" under the ADEA)).

Even so, certain events can cut off the accrual of back pay. One such event is a plaintiff's failure to be reasonably diligent in seeking substantially equivalent employment. *See, e.g., Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982) (holding that a Title VII plaintiff has a duty to mitigate damages); *see also, Massey Yardley*, 117 F.3d at 1251-52 (holding that, while an ADEA plaintiff "has a duty to mitigate damages by being reasonably diligent in seeking substantially equivalent employment, the burden of proving lack of diligence is upon the employer").

Another such event is a plaintiff's refusal to accept her former employer's unconditional offer of reinstatement. When a defendant unconditionally offers the plaintiff the position he or she previously applied for (or held prior to termination of

51

employment), that act immediately cuts off liability for back pay from the date of the offer.  *Ford Motor Co.*, 458 U.S. at 231-32, 102 S.Ct. at 3065-66.  The rule is designed to "encourage Title VII defendants promptly to make curative, unconditional job offers to Title VII claimants, thereby bringing defendants into 'voluntary compliance' and ending discrimination far more quickly than could litigation proceeding at its often ponderous pace."  *Id.* at 228, 102 S.Ct. at 3064.  It is only a short step from that proposition to the facts of this case, in which defendant unconditionally offered plaintiff continued employment, albeit in a less desirable position entailing a loss of status and pay.

The temporal proximity of plaintiff's FMLA leave to the elimination of her position, and, the company's concomitant failure to notify her of that decision until her return, is sufficient to raise suspicion, and this court is not unsympathetic to plaintiff's plight.  Her health problems were serious, and her recovery prolonged.  Moreover, when plaintiff returned to work, she discovered that her position had long been eliminated, and that defendant had not had the common courtesy to notify her.

Even so, plaintiff's employment was not terminated — she was offered an alternative position.  The FMLA does not entitle an individual to refuse to work, or to engage in insubordination.

52

Plaintiff could have accepted the form maker position under protest, and then challenged its legality.  If she found herself unable to perform the functions of a form maker, she could have requested more medical leave.  Indeed, at the time her employment terminated, plaintiff was entitled to fourteen additional weeks of paid medical leave under the company policy.  For such reasons, this court finds that she is not entitled to claim or recover back pay damages.

<b>CONCLUSION</b>

For all of the foregoing reasons, defendant's motion for summary judgment is due to be granted in part and denied in part. An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this the _13th_ day of February, 2001.

United States District Judge